GEORGES BOLLACK, Appellant, *v.* SOCIETE GENERALE POUR FAVORISER LE DEVELOPPEMENT DU COMMERCE ET DE L'INDUSTRIE EN FRANCE, Respondent.*

First Department, March 27, 1942.

* Revg. 177 Misc. 136.

*Joseph R. Kelley* of counsel [*Ann Nollen,* attorney], for the appellant.

*Harold W. Bissell* of counsel [*Davis, Polk, Wardwell, Gardiner & Reed,* attorneys], for the respondent.

*Bethuel M. Webster* of counsel [*Henry Cassorte Smith* with him on the brief; *Webster & Garside,* attorneys], for the French Government as *amicus curiæ.*

TOWNLEY, J. The complaint in this action alleges that on January 16, 1940, plaintiff caused to be delivered to the defendant, a French corporation doing business in the State of New York, various securities valued at $52,320, and that after a number of prior demands, defendant, on March 19, 1941, expressly repudiated the agreement of bailment and refused to act upon any instructions from the plaintiff with respect to the securities or any part thereof. It is then alleged that there has been a wrongful detainer and the plaintiff demands the value of the securities and $3,777 damages for the detention.

It is admitted in the answer that the securities were delivered and that they were to be held for the account of plaintiff subject to his exclusive direction and control. It is denied that the plaintiff was at any time the owner of the securities after October 29, 1940. A first separate defense is set up which pleads that on October 29, 1940, plaintiff was a national and citizen of France and "That plaintiff was deprived of his French nationality by a Decree of the French Government duly enacted on or about October 29, 1940, which Decree confiscated the assets of the plaintiff, including the securities specified in the complaint herein and accruals thereon."

The motion to strike out this defense is based on the claim that it is against the public policy of the State of New York to enforce foreign confiscatory decrees. The exact words of the decree are not pleaded in the above-quoted answer but we assume for purposes of this motion that the word "confiscatory" is to be given its natural meaning. In *Vladikavkazsky R. Co.* v. *New York Trust Co.* (263 N. Y. 369) the Court of Appeals had occasion to consider the effect of these decrees in relation to a bank deposit made on behalf of a Russian railroad corporation in New York city. In that case the Court of Appeals held:

" It is hardly necessary to state that the arbitrary dissolution of a corporation, the confiscation of its assets and the repudiation of its obligations by decrees, is contrary to our public policy and shocking to our sense of justice and equity. That the confiscation decree in question, clearly contrary to our public policy, was enacted by a government recognized by us, affords no controlling reason why it should be enforced in our courts. * * *

" Prior to recognition we clearly intimated that our decision would have been the same if at the time recognition had been granted. (*James & Co.* v. *Second Russian Insurance Co.*, 239 N. Y. 248, 257.) "

The facts in the *Vladikavkazsky R. Co.* case are substantially similar to those in the case before us.

The same public policy has been expressed by the Legislature of the State in section 977-b of the Civil Practice Act (added by Laws of 1936, chap. 917, amd. Laws of 1938, chap. 604, and Laws of 1941, chap. 926). The statute relates to the liquidation and distribution of assets of dissolved or nationalized foreign corporations. It is specifically provided in relation thereto that " any confiscatory law or decree thereof, shall not be deemed to have any extraterritorial effect or validity as to the property, tangible or intangible, debts, demands or choses in action of such corporation within the State * * *."

The same conclusion was reached by the English courts both before and after recognition of the Soviet government. (*Sedgwich, Collins & Co.* v. *Rossia Insurance Co.*, [1926] 1 K. B. 1, 15; affd., [1927] A. C. 95; *The Jupiter* [*No. 3*], [1927] P. 122, 144–146; affd., [1927] P. 250, 253–255; *Matter of Russian Bank for Foreign Trade*, [1933] Ch. Div. 745, 767, 768.)

The only cases which have given validity to confiscation decrees are cases arising under the Litvinov assignment. (*United States* v. *Manhattan Co.*, 276 N. Y. 396; *United States* v. *Belmont*, 301 U. S. 324, and *United States* v. *Pink*, 315 id. 203.) The effect of these decisions is that the Litvinov assignment and the title acquired thereunder must be given effect regardless of any local public policy to the contrary. This result was reached by the Supreme Court of the United States upon the ground that this agreement was an integral part of the adjustment of our foreign relations with Russia and that the exercise of this power by the Executive Department of the United States government was superior to any other consideration. As was said in *United States* v. *Belmont* (*supra*): " * * * no State policy can prevail against the international compact here involved. * * * In respect of all international negotiations and compacts, and in respect of our

foreign relations generally, State lines disappear. As to such purposes the State of New York does not exist."

Mr. Justice DOUGLAS in *United States* v. *Pink* (*supra*) said: " Enforcement of New York's policy as formulated by the *Moscow case* * would collide with and subtract from the Federal policy, whether it was premised on the absence of extraterritorial effect of the Russian decrees, the conception of the New York branch as a distinct juristic personality, or disapproval by New York of the Russian program of naturalization * * *. Enforcement of such State policies would indeed tend to restore some of the precise impediments to friendly relations which the President intended to remove on inauguration of the policy of recognition of the Soviet Government."

No such situation is presented in the case at bar and the public policy of the State of New York still exists and must be enforced by this court. Giving the words of the defense their usual meaning, there can be no doubt that the decree is offensive to this policy and cannot be given effect.

Aside from the formal words of the answer, the respondent has presented in its brief the substance of the decree. From this statement it appears that by decrees dated July 23 and October 29, 1940, the latter of which was directed against the plaintiff by name, it was decreed that " every Frenchman who quitted continental France between May 10 and June 30, 1940, to go abroad, without appropriate official authorization, * * * upon a report of an official of the Department of Justice, could by decree be deprived of his French nationality and of his property."

On this statement of the meaning of the defense there is even less room for argument as to its sufficiency than on the basis of a general principle of a public policy against confiscation. For it is settled law that courts organized under the principles of Anglo-Saxon law do not give effect to the penal statutes or decrees of other States. It was said in *Wisconsin* v. *Pelican Ins. Co.* (127 U. S. 265): " The rule that the courts of no country execute the penal laws of another applies not only to prosecutions and sentences for crimes and misdemeanors, but to all suits in favor of the State for the recovery of pecuniary penalties for any violation of statutes for the protection of its revenue, or other municipal laws, and to all judgments for such penalties." (See, also, *The Antelope*, 10 Wheat. 66, 123; *Huntington* v. *Attrill*, 146 U. S. 657, 666; *Marshall* v. *Sherman*, 148 N. Y. 9, 24, and *Banco de Vizcaya* v. *Don Alfonso de Borbon y Austria*, 1 K. B. [1935] 140.) The decree before us is obviously penal in its nature and unenforcible here.

---

* *Moscow Fire Ins. Co.* v. *Bank of New York & Trust Co.*, 280 N. Y. 286; affd., 309 U. S. 624.— [REP.

In connection with these decrees it should further be noticed that they are dated after the period covered by the offense sought to be punished. The law is, therefore, repugnant to the public policy expressed in the Constitutions of both the United States and the State of New York in that it is an *ex post facto* law. The first defense should, therefore, be stricken out.

The second defense sets up Executive Order No. 8389 and pleads that no license as required by this order has been obtained from the Secretary of the Treasury for the transfer by the defendant to the plaintiff of any of the securities mentioned in the complaint herein or for the payment of dividends or accruals received upon the said securities.

In the first place the refusal to recognize plaintiff's title to those securities has made it necessary to establish title since the denials in the first defense plead property in the third party. The real issue then in the case is plaintiff's title to the securities. We hold that this plea of non-compliance with a Federal regulation is no defense to this issue. As we regard the order, compliance therewith is a condition of the execution of any judgment that may be entered in favor of the plaintiff here. The defendant is entitled in any such judgment rendered against it to a provision that such judgment is not payable except on full compliance with whatever legal regulations are in force at such time. In this view of the case the second defense should be stricken out as having no relation to the issue tendered.

The order should be reversed, with twenty dollars costs and disbursements, and the motion granted.

MARTIN, P. J., GLENNON and UNTERMYER, JJ., concur; O'MALLEY, J., taking no part.

Order unanimously reversed, with twenty dollars costs and disbursements, and motion granted.